GILBERT GILES *v.* RALPH DiROBBIO, ET AL.

[No. 97, October Term, 1945.]

*Decided April 11, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS. GRASON, and HENDERSON, JJ.

*Linwood L. Clark* for the appellant.

*Louis M. Strauss* and *Samuel Schenker* submitted on brief for the appellees.

GRASON, J., delivered the opinion of the Court.

This is an action of trespass *quare clausum fregit* instituted in the Circuit Court for Anne Arundel County by the appellant against the appellees. To the declaration the general issue plea was interposed. The case was heard by the court without the aid of a jury, and from a judgment for the appellees an appeal was taken to this court.

Thereafter appellant filed a petition in the case alleging that subsequent to the rendition of the judgment, a man by the name of Towson told appellant that he had

a contract to purchase lot No. 16 (involved in this case) in 1920, and lived thereon until 1929, when he assigned his contract of sale to one Wilkinson; that Towson "drove said pipe by the side of the stone as it is now located, and that said stone is the true title stone." This stone will be referred to hereafter. Appellant avers that by no amount of diligence could he have discovered the testimony that Towson would have given if produced at the trial, as he lived far away, and his name is not shown in the chain of title. The petition prayed: (a) That the same be set for hearing; (b) "that 'in the exercise of its quasi equitable powers' said judgment be stricken out, without prejudice, and the case be restored to the trial docket upon withdrawal of the plaintiff's order of appeal"; (c) that upon withdrawal of said appeal by the plaintiff the court permit a dismissal, without prejudice, "upon such terms and conditions as the court deems proper," under trial rule 1 B; and (d) for further relief. The court dismissed this petition and from this action of the court appellant also appeals.

There is nothing in the petition to show that Simmons, who owned the property and laid out the development, told Towson that the stone in question was a monument marking a line in the courses and distances of the development, or that he saw the surveyor plant the stone. Nothing is stated to show the source of Towson's information as to this stone. This being so, the matter set out in the petition is immaterial.

It is the policy of the law that litigation be finally terminated. To permit appellant to dismiss the appeal, restore the case on the trial docket, and then dismiss the case, without prejudice, would be a violation of that policy. The only purpose of such proceeding would be to enable appellant to reinstitute the case, to the end that it be tried over again, in the hope of better results to the appellant. And the lower court could not consider the petition, after an appeal was taken to this court.

The petition seems to be a camouflaged motion for a new trial, and from the court's action on a motion for a

new trial no appeal lies, unless it can be shown that the court's action was arbitrary. But be this as it may, we think the court's action in dismissing this petition was correct and its ruling thereon is affirmed.

By deed dated January 7, 1919, Benjamin F. Simmons acquired from John A. Ruth and wife a tract of land situate in Anne Arundel County, containing 139.51 acres, more or less, and the following March caused a part thereof to be subdivided by Thomas H. Disney, a surveyor, and laid off into twenty lots, varying in size from 3 to $8\frac{55}{100}$ acres. Lots No. 1 to No. 15, inclusive, front on the Hammonds Ferry Road, and lots No. 16 to No. 20, inclusive, front on the River Road. The Disney plat shows lot No. 17 has a frontage on River Road of 151.5 feet and lots Nos. 18, 19 and 20 each front 150.2 feet on said road. It also shows that lot No. 16 has a frontage of 444 feet on River Road. The northwesternmost line of lot No. 20 runs north $30\frac{1}{2}$ degrees west. This is the northernmost line of the subdivision. The dividing lines between lots Nos. 16, 17, 18 and 19 run parallel with the northernmost line of lot No. 20. A plat thereof was made by Mr. Disney and it, together with the deed referred to, was filed among the Land Records of Anne Arundel County. This subdivision was called "Community Farms." When a lot in this development was conveyed to a purchaser reference to the same was made to the plat, and no description of the lot was given by metes and bounds, courses and distances. The plaintiff owns lot No. 16 and the defendants own lot No. 17, as shown on the plat.

The land involved in this dispute starts at a point at the northern end of the divisional line between these two lots, as shown on the Disney plat, and runs westerly along the River Road $19\frac{1}{2}$ feet and thence southeasterly along said divisional line to a point thereon, a distance of 444 feet. Appellees erected a fence along the divisional line shown by the Disney plat, and appellant sued them in this action, claiming that the true divisional line between the lots included the land in dispute and that the

same is his property. The first line in lot No. 16, as shown on the Disney plat, starts at a point on River Road, which is a projection of the divisional line between it and lot No. 17, and runs an easterly course 444 feet to a point in River Road. The second line runs from the last point south 22 degrees 30 minutes west 446.5 feet to a stone, and from that stone the third line runs south 66 degrees 8 minutes 10 seconds each 540 feet to a point. The fourth line runs from the last point south 10 degrees west 575 feet to the southernmost point in the divisional line between the two lots, as shown on the Disney plat. The stone at the end of the second line of lot No. 16, called for in the Disney plat, gives rise to the contention in this case.

The appellant employed Theodore Pantaleo, a surveyor who testified in the case, to check the lines of lot No. 16. He "tried to fit on the ground what was on the plat," and "did not go on the adjoining property at all," but "just stayed on Giles' lot." He did not check the entire description of the land comprising "Community Farms," as shown on the Disney plat. His purpose was to locate the stone at the end of the second line of lot No. 16, referred to on the Disney plat. He testified that the Disney plat was very incomplete, as far as bearings and some lines were concerned, and showed only distances and no bearings.

In cleaning up lot No. 16 Charles Giles, the father of appellant, removed a quantity of honeysuckle and other growth and discovered a stone beside which was driven in the ground a piece of iron that looked like an old axle. He showed this stone to Mr. Pantaleo, and he also showed to that gentleman a point in the River Road, which he said was the end of the first line of lot No. 16 as shown on the Disney plat. Starting at the stone shown him by Mr. Giles, he reversed the second line of lot No. 16 and came to a point in the road pointed out to him by Mr. Giles. From the stone, he ran the third and fourth lines of lot No. 16 and came to the southern end of the divisional line between lots Nos. 16 and 17, which he marked

by driving an iron pipe in the ground. From that point he ran the said divisional line 30 degrees north 30 minutes west 860 feet to a stone in said divisional line. From that point on, his check differs from the divisional line as shown on the plat, and he reaches the River Road 19 feet 5 inches west of the northernmost end of the divisional line as shown on the Disney plat.

The defendants employed Edward V. Coonan & Company to locate the line for them. Mr. Disney, who made the original plat of "Community Farms," was associated with that firm at the time he laid off the development and made the plat thereof, and for some years prior to his death. Mr. Sisson, a surveyor associated with Coonan & Company, and who testified for the defendants, produced in court the field book used by Mr. Disney at the time he made his original survey of "Community Farms" in March, 1919. He started his survey at the northwesterly outline of the whole tract comprising "Community Farms," and in locating that line he started in the center of River Road, at the northwest corner of lot No. 20. He located the westerly line of that lot from the fence and apparent line of possession there being, and from the stump of a cherry tree shown by Mr. Disney on his field book, at a point 5 feet northeast of the line and 503 feet from the road. From thence he measured easterly down the center of River Road 150.2 feet and came to a point where the prolongation of the line of the fence between lots Nos. 19 and 20 would have intersected the center line of the road. He then measured down the road another 150.2 feet and came to the point where the prolongation of the line of another fence between lots Nos. 18 and 19 would have intersected the center line of the road. He then measured down the road another 150.2 feet, and came to the dividing line between lots Nos. 17 and 18. He found no fence there. He then continued down River Road 151.5 feet and came to what he considered the northeast corner of lot No. 17, and the northwest corner of lot No. 16. He then ran a line 21¼ degrees east, having allowed 1 degree 15 minutes

for variation, 1,304 feet to a point to the south end of the divisional line between lots Nos. 16 and 17, shown on the Disney plat, and where the iron pipe had been driven in the ground, presumably by Mr. Pantaleo.  This check of outlines of "Community Farms" corresponds exactly with the plat prepared by Mr. Disney.  It gives lots Nos. 17 to 20, inclusive, the exact frontage on River Road that the Disney plat shows, and the divisional line between lots Nos. 16 and 17, as checked by Mr. Sisson, is parallel with the divisional lines between lots Nos. 17, 18, 19 and 20, respectively, and is identical with the divisional line shown on the Disney plat.

Pantaleo ran from the southern end of the divisional line between lots Nos. 16 and 17, as shown on the Disney plat, and along and with that line in a northwesterly direction to a point 860 feet on that line, and he says that point is 61 feet to the stone at the end of the second line of lot No. 16, as shown on the Disney plat.  He calculated the distance from the said point on the divisional line to the stone, to be 61 feet.  He allowed for variation, 51 minutes, while Mr. Sisson used $1\frac{1}{4}$ degrees, or 75 minutes.  While variation of the magnetic needle changes with the years, a line which has been run on the ground never changes.  The court below said:

" 'Calls,' when they can be found, prevail over courses and distances because they have the greater certainty; but it is equally true that this rule is only a rule of construction to ascertain the intention of the parties and will not be applied when it would defeat such intention as clearly shown.  Where maps or plats are referred to in descriptions of land, they are to be regarded as incorporated into the description and they stand on the same footing as monuments, and in case of a conflict of calls the usual rules of construction are to be applied and those calls which are most certain and definite and most in accord with the true intent of the parties, are to be adopted.  (9 *Corpus Juris*, Sec. 143, pages 220, 221.)"  It further stated: "When Mr. Simonds had Mr. Disney lay off these lots, he did so with the idea that all the lines as shown

on the plat were correct, and that he expected to be able to deliver to the purchaser of each and every lot shown on the plat, the actual ground he or she purchased." See also *Wood v. Hildebrand,* 185 Md. 59, 42 A. 2d 919.

If we adopt Mr. Pantaleo's survey as correct it would result in a relocation of the divisional lines between lots Nos. 17, 18, 19 and 20, as shown on the Disney plat. It would further result in the extension of lot No. 20, to the west, 19 feet 5 inches, running back to a point on its northwesternmost line 444 feet, on land of a stranger, that never was included in and a part of the "Community Farms" development. Under these circumstances, we cannot give to Mr. Pantaleo's testimony the effect urged by the appellant.

After the case was closed the court reopened the same to permit appellant to offer the testimony of Mr. Hall, the County Surveyor. Without discussing the testimony of this witness in detail, it is sufficient to say that the witness regarded his survey as incomplete. He abandoned the survey because the appellant would not agree to pay him the fee he required. When asked the question: "You don't know whether your testimony helps one or the other?" he answered: "I have no idea." "Q. You don't know where the line you ran hit the road as compared with Pantaleo's and Coonan's survey? A. I have no idea." "Q. You don't know how much land was left diRobbio on the road? A. If the pipe and stone were right, it would seem to scramble everything to the southwest of diRobbio's and Giles' corner." It is apparent that the testimony of Mr. Hall does not help in this case.

There is grave doubt whether the stone pointed out by Mr. Giles to his surveyor is the stone referred to on the Disney plat. Disney does not call for a stone with an iron bar driven beside it, and the stone found by Mr. Giles is not shown to be an ancient monument recognized for years by the people in the community to be such. There is no evidence in the case that Mr. Simmons, the original owner of "Community Farms," ever told

anyone that the stone found by Giles was the stone referred to on the Disney plat. No one testified that he saw Mr. Disney, while making the survey, plant the stone found by Giles. Neither Mr. Giles, nor any witness called by appellant, attempts to give his source of information from which it is claimed that the stone found by Giles was the stone referred to by Mr. Disney and shown on the plat he made of "Community Farms." *Marvil Package Co. v. Ginther,* 154 Md. 213-221, 140 A. 95.

Objection was made to Mr. Sisson's use of Mr. Disney's field book. The book was definitely proved to be the book that Mr. Disney used when he made the survey in 1919. Mr. Sisson, while testifying, referred to Mr. Disney's notes in this book. We can see no reason why this was improper, and the court was correct in overruling the objection made by appellant. Sisson's survey confirms the original survey made by Disney. Appellant claims that the Disney notes should have been offered in evidence, and cites *Walker v. Curtis,* 116 Mass. 98. The witness had Disney's original notes before him when he testified. Appellant's counsel had a right to look at them. To all intents and purposes they were offered in evidence. The objection upon this ground is highly technical.

Objection was made to Mr. Sisson's testimony that there was a fence on the divisional line between lot No. 20 and lot No. 19, and between the latter lot and No. 18. He contends that this violates the rule that no object not shown on a plat can be described in evidence, and refers to *Neal v. Hopkins,* 87 Md. 19, 39 A. 322; *Carroll v. Norwood,* 1 Har. & J. 100; *Wood v. Ramsey,* 71 Md. 9, 17 A. 563. In those cases defense was upon warrant, and the surveyor, in making his return to the court of his action under the warrant, accompanied the same by a plat of the property involved. Those cases hold that a plat so made cannot be added to or changed by parol evidence. In this case there was no warrant of resurvey. Sisson made the survey for the appellees and he took into consideration the fences that he testified to.

·We think that was proper and the court was correct in overruling the appellant's objection.

In the case of *Resurrection Gold Mining Co. v. Fortune Gold Mining Co.*, 129 F. 668, 670: "The plaintiff's title rested upon a patent issued in 1894, and the description in that patent upon the survey for patent made in January, 1882."

The court said: "A plain and unambiguous description in a written conveyance can no more be contradicted or modified by parol evidence than any other part of a written agreement. * * * The patent in the case before us disclosed no ambiguity, and presented no conflict between its courses and distances."

This case presents a question of ambiguity because, as testified to by Mr. Pantaleo, the Disney plat "was very incomplete as far as bearings and some lines are concerned, and only distances and no bearings were given and that it was impossible to go into the field and check the angles." We do not see that this case is an authority to sustain the objection made by appellant.

It was argued in this court by counsel for appellant that the land in dispute was in the possession of appellant when appellees committed the alleged trespass. Apparently there was nothing at all in the way of a fence or anything else erected along the divisional line between the lots in question. One looking at the *locus in quo* would be unable to tell where the divisional line laid down on the plat was, and the two lots merging at the divisional line would appear to be an undivided tract of land. The only act relied upon to show possession in appellant was the running of a line from a point on the divisional line 444 feet to a point on the River· Road 19 feet 5 inches easterly from the end of the divisional line as shown on the plat. This act did not constitute taking possession of the area in controversy. It amounts to simply a claim that the line they ran was the correct line between the two lots, and a question of title to the disputed area is presented. If the *land*

*in question* was, in fact, a part of lot No. 17, of course there was no trespass.

Appellant cites Section 255, Vol. 2, 4th Ed., *Cooley on Torts,* and *Smith v. Schlink,* 6 Colo. App. 228, 40 P. 478. These authorities deal with forcible entry, and appellant says that title in such an action is not inquired into. But this is not a case of forcible entry. Such a case originates in a proceeding instituted before a justice of the peace and not in a common-law court. The matter has been fully dealt with in the following cases, one involving forcible entry and detainer, and the other forcible detainer. *Roth v. State,* 89 Md. 524, 43 A. 769, and *Clark v. Vannort,* 78 Md. 216, 27 A. 982.

"It is well settled in this State that an action of trespass *quare clausum fregit* is available for the trial of title to land (*Ridgely v. Bond,* 17 Md. 22; *Poe Pl.,* Sec. 244, and cases there cited) ; but when it is resorted to for that purpose 'recovery can be had only on the strength of the plaintiff's title, just as in ejectment' (*New Windsor v. Stocksdale, supra.*) It would be necessary in ejectment for the plaintiff to establish a legal title to the land in dispute. * * * In this form of proceeding at law, adopted for the identical purpose that would be accomplished by an ejectment suit, so far as the determination of the title is concerned, the same principle should control." *West v. Pusey,* 113 Md. 569, at 571, 572, 77 A. 973, 974.

"To maintain an action of trespass *quare clausum fregit,* the plaintiff must either 'show title to the land on which the trespass was committed, or that he was in actual possession thereof at the time of the trespass.' See *Norwood v. Shipley,* 1 Har. & J. 295." *Ridgely v. Bond.* 17 Md. 14. See *Ditto v. Wolf,* 153 Md. 449, 138 A. 331.

As appellant has shown neither a right of possession nor title to the land in question, the judgment below will be affirmed.

*Judgment affirmed, with costs.*